UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MILTON DEAN COCKERHAM, 2+ ("Two Plus"), LLC,<br><br>　　　　　　　Plaintiffs,<br><br>　v.<br><br>ROBERT SELLERS, JEFF DAY, BRIAN FLATTER, JOHN DOES 1-10,<br><br><br>　　　　　Defendants. | Case No. 1:09-CV-333-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it Defendants' Motion for Summary Judgment (Dkt. 16). The Court heard oral argument on February 11, 2011, and took the motion under advisement. For the reasons explained below, the Court will grant the motion.

## BACKGROUND

In October 2006 Plaintiff Mickey Cockerham and his business partner Kenny Anderson purchased 70 acres and a ranch house along the Snake River in Hammet, Idaho and formed the company 2+("Two Plus") LLC. *Cockerham Aff.*, Exhibit C at 1, Dkt. 20-6. Cockerham and Anderson intended to sell shares of Two Plus and create a hunting club for duck and other game along the river habitat. *Id.* In the course of purchasing this

property, Cockerham and Anderson learned that several of the river islands in front of the ranch house were privately owned by Lucille Wilson.  *Id.*

Beginning in November 2006 and continuing throughout the following year, Cockerham made improvements to the land and began advertising for the hunting club. *Id.* at 1-2.  Cockerham used the *Idaho Statesman* to advertise, as well as two websites where prospective buyers could review the suggested club format and the available ownership fractions for sale.  *Id.* at 2.

The opening of duck season in October 2007 brought with it several incidents in which hunters, while boating in the river or traveling along the private islands, shot their guns towards Cockerham's property.  *Id*. at 3-5. On several occasions hunters fired shots at the property, towards him or his family members, without the presence of ducks in flight.  *Id.*

Near the end of October 2007, Cockerham and his brother went to the Jerome, Idaho Department of Fish and Game to talk to the local Conservation Officer about the shooting and harassment incidents.  *Id.* at 5.  The officer told Cockerham and his brother that any hunter who shot towards the property was trespassing and that they needed to call the local sheriff immediately the next time it occurred.  *Id*.  The officer also told the brothers that he would call the Elmore County district to report the problem and have the County contact the brothers.  *Id.* However the brothers never heard from Fish and Game regarding the matter.  *Id*.

On November 13, 2007 Cockerham and his brother phoned Ann Wilson, Lucille

Wilson's daughter and manager of her mother's properties, in order to inform her of the shooting and harassment issues. *Id*. at 6. Cockerham asked Wilson for permission to post Wilson's islands as private in an effort to curb the trespassing and shooting. *Id.* Wilson agreed. *Id*.

During mid-November 2007, Defendant Robert Sellers, a Conservation Officer with the Idaho Department of Fish and Game, received a phone call from a person who reported that someone had posted public land near Hammett as privately owned. *Sellers Aff., ¶* 3, Dkt. 16-3. A few weeks later Sellers received another similar phone call, prompting Sellers and a Bureau of Land Management Ranger to go out and examine public property that reportedly had been posted as private. *Sellers Aff., ¶* 4, Dkt. 16-3. During this investigation Sellers discovered that several public islands in the Snake River had been marked as private. *Sellers Aff., ¶* 5, Dkt. 16-3. A larger island ("Sparlin Island"), which Elmore County Assessor Records indicated was owned by Lucille Wilson, was also posted as private property. *Sellers Aff., ¶* 6, Dkt. 16-3.

A few days later Sellers telephoned Ann Wilson in order to ask her about the posting of Sparlin and the other nearby islands. *Sellers Aff., ¶* 7, Dkt. 16-3. Wilson informed Sellers that her mother owned Sparlin Island, but that she did not know who owned the other nearby islands. *Sellers Aff., ¶* 8, Dkt. 16-3. During that conversation Wilson stated that Cockerham had recently contacted her to request permission to post her mother's islands as private property so as to prevent errant shots towards Cockerham's property. *Sellers Aff., ¶* 9, Dkt. 16-3.

On November 23, 2007 Cockerham took his nine year-old son, Clancy, and his fifteen year-old friend, Jake Davis, to the ranch in Hammet to work on cleaning and repair projects. *Cockerham Aff.*, Exhibit C at 6, Dkt. 20-6. Around 12:30 PM, Cockerham, his son, and his son's friend heard a shot from the island approximately one hundred yards away and directly across from the ranch house. *Id*. Cockerham ran to the edge of the lawn and observed a boat, a dog, and four men dressed in camo gear walking around the island nearest him. *Id*. Cockerham saw that at least one of the men had a shotgun. *Id.* He yelled over to the men to inform them that they were trespassing and they had fifteen minutes to leave. *Id.* One of the men responded by questioning "or what?" and Cockerham said "or I will call the Sheriff." *Id.* One of the men yelled back, "call the sheriff" and then fired a shot. *Id.*

Upon hearing the shot fired, Cockerham crouched down and heard what he thought sounded like pellets hitting the roof of the house, trees, and windows facing the direction of the men. *Id.* Cockerham then told his son and friend to take cover, to which the friend responded "they are shooting at us." *Id.* Cockerham directed the children to run down to the shop and stay there, and told the boys he was going to call the sheriff. *Id.* Cockerham also noticed that the men's black lab had jumped into the river and began swimming in his direction after the shot had been fired, until one of the men called the dog back, by yelling "no bird." *Id*. 5-6. During this commotion Cockerham's own dog jumped into the river and followed the other lab to the men on the island.

Cockerham immediately called the Elmore County Sheriff's department to request

an officer. *Id*. at 7. While waiting for a deputy to arrive, Cockerham observed the men walking through the brush on the island until they were out of sight, taking Cockerham's dog with them. *Id.* Cockerham then heard two additional shots taken. *Id.*

When the deputy sheriff arrived, approximately twenty-five minutes after the call, Cockerham told him that there were men on the island shooting at him and the children, and that he thought the men killed his dog. *Id.* The deputy walked over to the dock and called over to the men asking them if they knew they were trespassing. *Id.* The men then asked who owned the island. *Id.* The deputy relayed to the men, via Cockerham's response, that Lucille Wilson owned the island. *Id.*

Next, the deputy and Cockerham observed as one of the men on the island removed a no trespassing sign and threw it into the brush. *Id.* The officer then asked the men to boat over to the dock so that he could speak with them, but the men turned away and ignored the deputy. *Id.* The officer asked again, this time louder, and the men still did not respond. *Id.* The officer then told Cockerham that he needed to call for backup. *Id.* About fifteen minutes later the Glenns Ferry Sheriff arrived. *Id.* Cockerham told the Sheriff that the islands were owned by the Wilsons and posted as private. *Id.* When the men on the island saw the second officer they climbed into their boat and headed for the dock. *Id.*

As the men headed towards the dock, Cockerham left to check on the children inside the house. *Id.* at 8. When Cockerham returned the deputy informed him that the men were Idaho Department of Fish and Game Conservation Officers, and that they

wanted to talk to him.  *Id.*

Outside of the ranch house Cockerham met with the deputy, the Glenns Ferry Sheriff, and three Fish and Game Conservation Officers: the aforementioned Robert Sellers, as well as Jeff Day, and Brian Flatter.  *Id.*  The three Conservation Officers questioned Cockerham about the posting on the nearby islands as well as the connection between Cockerham's hunting club and the use of the islands.  *Cockerham Aff.*, Exhibit C at 8, Dkt. 20-6.  Cockerham denied posting the islands, and told the officer he thought his brother had posted the islands.  *Id.*  He also told the officers that Ann Wilson had given Cockerham and his brother permission to post on her islands.  *Id.* Sellers then accused him of including Lucille Wilson's island on the Two Plus website as part of the hunting club.  *Id.*  Cockerham denied this.  *Id.*

Cockerham next claims that "the five men had surrounded me and interrogating(sic) me in a Gestapo type manner," and that "[s]everal time the three F and G officers were moving towards me and then away in a taunting manner." *Id.*  During this questioning  Sellers yelled at Cockerham, their faces just inches apart, and Sellers screamed "so loud and hard that he spit on [Cockerham]."  *Id.*

In the course of questioning, the deputy asked the Defendants about the shot fired towards Cockerham's property, and the Defendants denied shooting in his direction.  *Id.* The deputy found no probable cause to think that the Defendants had committed a crime and did not charge any of them for their actions.  *Sellers Aff., ¶* 24, Dkt. 16-3; *Day Aff., ¶* 16, Dkt. 16-4; *Flatter Aff., ¶* 19, Dkt. 16-5.  The deputy did however chastise Cockerham

for allegedly misleading him about gunshots being directed towards his property. *Sellers Aff.,* ¶ 25, Dkt. 16-3; *Day Aff.,* ¶ 14, Dkt. 16-4; *Flatter Aff.,* ¶ 17, Dkt. 16-5, *see also, Cockerham Aff.*, Exhibit C at 8, Dkt. 20-6. Cockerham felt harassed, and told the officers that he was not comfortable with the line of questioning at that he wanted to consult his attorney. *Cockerham Aff.*, Exhibit C at 8, Dkt. 20-6. The officers ignored his requests and continued questioning him. *Id.*

After thirty to forty minutes of questioning, Cockerham asked the Defendants if they planned to issue him a citation for illegally posting public lands. *Id.* at 9. One of the Defendants told him that there would likely be state and federal charges for illegally posting on public land as soon as they completed their investigation. *Id.* Cockerham then asked the Defendants why they chose to investigate the area rather than call Cockerham directly. *Id.* The Defendants did not directly answer this question, but admitted speaking to Ann Wilson, researching Two Plus at the county assessor's office, and viewing Cockerham's websites. *Id.* Shortly thereafter all five officers left. *Id.* Ultimately, the Idaho Fish and Game cited Cockerham for unlawfully posting public property as private. *Sellers Aff.,* ¶ 26, Dkt. 16-3; *Day Aff.,* ¶ 15, Dkt. 16-4; *Flatter Aff.,* ¶ 18, Dkt. 16-5.

Cockerham believes the Conservation Officers chose not to contact him directly in order to set up a sting operation designed to provoke him. *Cockerham Aff.*, Exhibit C at 10, Dkt. 20-6. Cockerham also believes that Sellers manipulated Ann Wilson, and defamed Cockerham, by insisting that Cockerham was attempting to sell her mother's island as part of the hunting club. *Id.* at 10-11. Finally, Cockerham believes the

Defendants caused defamatory articles to be published in the *Idaho Statesman* that harmed his property and business interest. *Pl's Compl.* at 7, Dkt. 1.

## LEGAL STANDARD

### 1. Summary Judgment

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving party, *id.* at 255, and the Court must not make credibility findings. *Id.* Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)

(en banc). This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Liberty Lobby*, 477 U.S. at 256-57. The nonmoving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003). Statements in a brief, unsupported by the record, cannot be used to create an issue of fact. *Barnes v. Independent Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995).

## ANALYSIS

## 1. Defendants' Motion for Summary Judgment

Defendants seek summary judgment on all three of Plaintiffs' claims. The Court will address each claim below.

### A. *RICO CLAIM*

Plaintiffs Cockerham and "Two Plus" ("Cockerham") allege a RICO claim against Defendants. "A civil RICO claim requires allegations of the conduct of an enterprise through a pattern of racketeering activity that proximately caused injury to the plaintiff."

*Swartz v. KPMG LLP*, 476 F.3d 756, 760-61 (9th Cir. 2007) (*citing Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). Defendants argue that Cockerham's RICO claim fails as a matter of law because Cockerham fails to prove a pattern of racketeering activity. The Court agrees.

To establish a pattern of racketeering activity, a plaintiff must prove the occurrence of "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). These predicate acts include violating federal mail and wire fraud statutes. 18 U.S.C. § 1961(1); *see also* §§ 1341, 1343.

This two act requirement is necessary but may not be sufficient. *H.J. Inc. v. Northwestern Tel. Co.*, 492 U.S. 229, 237 (1989). Two of anything do not generally form a pattern. Legislative history suggests that "[t]he target of [RICO] is . . . not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496, n. 14 (1985) (emphasis in original) (citing S.Rep. No. 91-617, p. 158 (1969)).

Here, Cockerham alleges that Defendants told Cockerham's relative that he was a fraud, and that he was selling his relative's property on Ebay. He also alleges that Defendants caused defamatory articles to be published in the *Idaho Statesman* newspaper.

*Complaint*, ¶ 21, Dkt. 1.  He claims that these acts occurred from at least 2007 through the present.  *Id*.

These allegations do not come close to the type of allegations required to allege a pattern of racketeering activity.  At most, Cockerham has alleged a couple defamation claims.  Moreover, these actions are not continuous.  It is impossible to determine whether these few acts occurred over the span of a day, a week or the two years between 2007 and when the Complaint was filed.  This is the type of sporadic activity not targeted by RICO.  Accordingly, the Court will grant Defendants' motion for summary judgment on the RICO claim.

   **B.**   ***Section 1983 Claims***

Cockerham also asserts a § 1983 claim against Defendants.  Defendants ask the Court to dismiss all portions of the § 1983 claim because they are entitled to qualified immunity.

Section 1983 aims to deter state actors from using their authority to deprive individuals of federally guaranteed rights, and to provide relief to victims when deterrence has failed.  *Wyatte v. Cole*, 504 U.S. 158, 161 (1992).  To state a Section 1983 claim, a plaintiff must allege facts that evidence a deprivation of privilege, immunity or right by federal law or the Constitution by an individual acting under color of state law. *Id.*

"The doctrine of qualified immunity protects government officials' from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Firzgerald,* 457 U.S. 800, 818 (1982)). The Supreme Court established a two-pronged inquiry to resolve all qualified immunity claims:

> First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional rights. Second... the court must decide whether the right at issue was "clearly established" at the time of the Defendants' alleged misconduct. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.

*Id.* The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose,* 402 F.3d 962, 971 (9th Cir. 2005). This inquiry is wholly objective and is undertaken in light of the specific factual circumstance of the case. *Id.*

The Supreme Court recently held that courts need not first determine whether the plaintiff demonstrated a constitutional violation, and may find officers entitled to qualified immunity if they find that the defendant officers' action did not violate a clearly established right. *Pearson v. Callahan,* 128 S.Ct. 808, 818 (2009). Thus, "if the officer's actions do not amount to a constitutional violation, the violation was not clearly established, or their actions reflected a reasonable mistake about what the law requires, they are entitled to qualified immunity." *Brooks v. City of Seattle,* 599 F.3d 1018, 1022 (9th Cir. 2010).

Here, Cockerham's Complaint is less than clear with respect to Cockerham's § 1983 claims. It appears Cockerham asserts four general allegations: (1) an equal protection violation under the Fourteenth Amendment; (2) a due process violation under the Fifth and Fourteenth Amendments; (3) an Eighth Amendment violation for cruel and unusual punishment; and (4) a Fourth Amendment violation for unreasonable search and seizure by excessive force similar to that in *Robinson v. Solano County*, 278 F.3d 1007, 1013 (9th Cir. 2002). Cockerham fails to address the first three allegations in his response brief. Therefore, the Court will only briefly address them before dismissing them. The real focus of Cockerham's § 1983 claim is his unreasonable seizure/excessive force claim, which the Court will address in more detail.

### *(1) Equal Protection*

In his Complaint, Cockerham broadly alleges that Defendants violated his rights to equal protection under the law. *Pl's Compl.* at 14, Dkt. 1. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situation should be treated alike." *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 570 (9th Cir. 1990). An individual may bring a cause of action under the equal protection clause for a "class of one" if the plaintiff alleges he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (Per Curiam).

In this case, Cockerham makes no allegation that he was treated differently from any other similarly situated individual. His Complaint provided Defendants and the Court with no insight into how his equal protection rights were violated, other than to make a blanket statement within a paragraph listing several other claims. Thus, where the Defendants' actions did not violate a clearly established right, they are entitled to qualified immunity and summary judgment on this claim.

### (2) *Due Process*

Cockerham also broadly alleges that Defendants violated his Fifth and Fourteenth Amendment rights to procedural and substantive due process. *Pl's Compl.* at 14, Dkt. 1. The Fifth and Fourteenth Amendments to the United States Constitution bars the federal government and the states from depriving any person of life, liberty, or property, without due process of law. *Nordyke v. King*, 563 F.3d 439, 449 (9th Cir. 2009); U.S. Const. amend. XIV, § 1; U.S. Const. amend. V. A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Hufford v. McEnaney*, 249 F.3d 1142, 1150 (9th Cir. 2001).

Cockerham specifically alleges Defendants failed to read him his Miranda rights. However, Defendants did not arrest Cockerham. Furthermore, where Defendants did not take or injure his property interest, his procedural due process claims are meritless. And without a specific allegation as to how Defendants violated his substantive due process rights, that claim also fails. Therefore, Defendants are entitled to summary judgment on

this claim as well.

### (3)    *Cruel and Unusual Punishment*

The Eighth Amendment of the United State Constitution prohibits cruel and unusual punishment.  U.S. Const. amend. VIII.  "To sustain an Eighth Amendment claim, the plaintiff must prove a denial of the minimal civilized measures of life's necessities, occurring through deliberate indifference by prison personnel or officers.  *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996).

Once again Cockerham makes only a blanket statement alleging a violation of the Eighth Amendment, and his Complaint provides no insight as to the violation.  In this case, Cockerham was never arrested, although he was ultimately fined for illegal posting of public lands.  Defendants' interrogation of Cockerham occurred in response to Cockerham calling the sheriff to make a "shots fired" report against Defendants. Although Cockerham alleges that Defendants conducted a "Gestapo type" interrogation, and that Sellers yelled so loud as to spit on Cockerham, he never claims that he was taken into custody and detained or that the Defendants' physically accosted him.  Such conduct, although potentially offensive, does not demonstrate a violation of the Eighth Amendment.  Accordingly, the Court will grant Defendants' motion for summary judgment as to the Eighth Amendment claim.

### (4)    *Unreasonable Search and Seizure and Excessive Force*

In his Complaint, Cockerham alleges that he suffered an unreasonable search and seizure and excessive force.  However, he never specifically alleges an unreasonable

search.  Instead, it appears he simply attached an unreasonable search claim to his unreasonable seizure claim.  Therefore the real question before the Court is whether Cockerham suffered an unreasonable seizure.  To make that determination, the Court must first consider whether a seizure occurred, and then determine whether it was unreasonable based on excessive force and whether Defendants are entitled to qualified immunity.  *Robinson v. Solano County*, 278 F.3d 1007, 1013 (9th Cir. 2002).

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures."  U.S. Const. amend. IV.  In order for a seizure to have occurred, there must be a restraint of liberty such that the person reasonably believes he is not free to leave.  *Fuller v. Vines*, 36 F.3d 65 (9th Cir. 1994) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (holding that police drawing a gun, in order to prevent plaintiff's attack, did not constitute a seizure where the police drew the gun at a distance and there was no allegation that the use of the gun restricted the plaintiff's liberty)).

For example, in *Robinson v. Solano County*, the Ninth Circuit found that a seizure occurred when the police detained and handcuffed the plaintiff, and then pointed a gun at close range to his head, resulting in plaintiff's reasonable belief that he was not free to leave.  *Robinson v. Solano County*, 278 F.3d 1007, 1013 (9th Cir. 2002).  Additional "[e]xamples of circumstances that might indicate a seizure, even where a person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of

language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. 544 at 554.  In *Fuller* and *Robinson* the Ninth Circuit reasoned that the seizure occurred because of the plaintiff's reasonable belief that he was prevented from leaving the hostile environment.

Here, Cockerham alleges that he suffered an illegal seizure when: (1) "Defendants shot at his property, at his person and at the person of his 9 year old son, causing them to run and duck for cover; and (2) "when the Defendants surrounded him in an extremely hostile and abusive manner, clearly trying to provoke him into a fight, [and] did not Mirandize him while questioning him about the facts of the alleged posting of public lands. . . ."

With respect to the first allegation, when Defendant Flatter shot the gun in the direction of Cockerham and the children, Cockerham was able to "run and duck for cover," call the sheriff's department, and watch Defendants as they moved around the island in and out of Cockerham's line of sight.  He makes no reasonable allegation that he was not free to leave during this time.  Thus, the shot did not result in a seizure.

However, when Defendants "surrounded [Cockerham] in an extremely hostile and abusive manner," Cockerham may have reasonably believed he was not free to leave. Although Cockerham never alleges that Defendants used the gun as part of the interrogation or that there was any physical touching, he does claim that he experienced the threatening presence of several officers, and that Defendants' tone and body language suggested that he was compelled to undergo an interrogation.  *See Cockerham Aff.*, Exhibit

C at 8, Dkt. 20-6. Cockerham recalls how he felt threatened by the officers:

> He [Sellers] not only yelled at me, but was pushing me backwards by pushing his chest towards mine. As any movement by me in this situation would warrant an arrest by any of them, I was forced to start agreeing with everything they said. I was severely out numbered and they were armed . . . . They would not let me move out of their circle and stood in front of me at every turn.

*Cockerham Aff.*, Exhibit C at 9, Dkt. 20-6. Under the facts as alleged by Cockerham, a seizure may have occurred when Defendants surrounded and interrogated him.

The Court must therefore "turn to the question of whether the seizure was unreasonable because the officers used excessive force, i.e., force that was not 'objectively reasonable' in light of the facts and circumstances confronting the officer." *Robinson*, 278 F.3d at 1013. "All claims that law enforcement officers have used excessive force – deadly or otherwise – in the course of an arrest must be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Smith v. City of Hemet*, 394 F.3d 689, 700 (9th Cir. 2005)(en banc). Such analysis requires balancing the nature and quality of the intrusion on the alleged victim's liberty with the countervailing governmental interests at stake to determine whether the use of force was reasonable. *Id.* at 701. This determination "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Robinson*, 278 F.3d at 1013-14. Summary judgment is appropriate if the Court concludes that "after resolving all

factual disputes in favor of the plaintiff, that the officer's use of force was *objectively reasonable* under the circumstances." *Scott v. Henrich*, 39 F.3d 912, 915 9th Cir. 1994) (emphasis added).

Here, the Court must consider whether Defendants' temporary seizure, via interrogation, is offset by Defendants' governmental interest as Conservation Officers investigating the unlawful posting of private lands. The unlawful posting of private lands is somewhere near the very bottom of any severity scale. In fact, Cockerham ultimately received only a citation for his actions. *Sellers Aff.* ¶ 26, Dkt. 16-3; *Day Aff.* ¶ 15, Dkt. 16-4; *Flatter Aff.* ¶ 18, Dkt. 16-5. Moreover, Cockerham never posed a threat to the officers or attempted to flee.

However, the amount of force used by the officers was minimal if not nonexistent. Although one officer had a shotgun in his possession, Cockerham does not allege that the officer brandished the shotgun or used the gun forcefully in any manner during the interrogation. Moreover, Cockerham does not allege that the officers physically touched or harmed him. Further, Defendants did not force Cockerham to leave his property and they did not arrest him. Thus, even though Defendants may not have used the least possible force, they did not employ much force at all. *Forrester v. City of San Diego*, 25 F.2d 804, 806 n.2 (9th Cir. 1994).

Furthermore, Cockerham's argument that *Robinson* suggests that a seizure is per se unreasonable where an officer used a gun, aiming or shooting it at the plaintiff who poses no harm, does not apply here. In this case, Defendants' temporary seizure of Cockerham

did not occur when Defendant Flatter shot the gun on the island.  Instead, the seizure

occurred almost half an hour later during Defendants' interrogation of Cockerham, where

the gun was never brandished or used.  The only force Defendants' employed during the

seizure was verbal and non-physical.

Under these circumstances, the Court finds that the amount of force used (if any)

was objectively reasonable.  Therefore, the officers' actions do not amount to a

constitutional violation, and they are entitled to qualified immunity. Accordingly,

Cockerham's unreasonable seizure by excessive force claim fails as a matter of law.

### C.      *Section 1985 Claim*

In his Complaint, Cockerham asserts Count III as a conspiracy to interfere with

civil right pursuant to 42 U.S.C. § 1985.  Specifically, Cockerham claims that the

Defendants intentionally thwarted his opportunity to advertise and promote his business

when Defendants "cited, shot at, threatened and assaulted [Cockerham] while in the

custody of the Defendants."  *Pl's Compl.* at 15-16, Dkt. 1.  This claim fails as a matter of

law.

Section 1985 includes the following three subsections: (1) preventing an officer

from performing duties; (2) obstructing justice, intimidating party, witness, or juror; and

(3) depriving persons of rights or privileges.  Cockerham makes no attempt to reference

which subsection Defendants violated, but it seems clear from the Complaint that

subsections (1) and (2) do not apply.

"The elements of a § 1985(3) claim are: (1) the existence of a conspiracy to

deprive the plaintiff of the equal protection of the laws; (2) an act in furtherance of the conspiracy and (3) a resulting injury." *Addisu v. Fred Mayer, Inc.*, 198 F.3d 1130, 1142 (9th Cir. 2000). However, "[a]n indispensable element of a claim under 42 U.S.C. § 1985(3) is some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's action..." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 989 (9th Cir. 2001). Cockerham made no such allegations in his Complaint, and failed to respond to Defendants' motion or otherwise provide evidence supporting this claim. Accordingly, the Court will grant the motion for summary judgment on the claim.

## ORDER

**IT IS ORDERED:**

1.  Defendants' Motion for Summary Judgment (Dkt. 16) is **GRANTED**. The Court will enter a separate judgment in accordance with Fed. R. Civ. P. 58.

DATED: **February 17, 2011**

Honorable B. Lynn Winmill
Chief U. S. District Judge